## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 26 2020, 8:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT, M.M.

John R. Worman
Evansville, Indiana

ATTORNEY FOR APPELLANT, R.N.

Katharine Vanost Jones
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent Child Relationship of S.M., P.M., and R.M.;

M.M. (Father) and R.N. (Mother),

*Appellants/Respondents,*

   v.

The Indiana Department of Child Services,

*Appellee/Petitioner.*

June 26, 2020

Court of Appeals Case No. 19A-JT-2002

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

Trial Court Cause Nos.
82D04-1808-JT-1557
82D04-1808-JT-1558
82D04-1812-JT-2306

**Pyle, Judge.**

# Statement of the Case

R.N. ("Mother") and M.M. ("Father") (collectively ("Parents")) each appeal the termination of the parent-child relationship with their three sons. Mother argues that the trial court erroneously denied her motion to dismiss the termination proceedings. Father argues that the trial court abused its discretion when it admitted evidence. Parents argue that their due process rights were violated because the Department of Child Services ("DCS") failed to make reasonable efforts to preserve the parent-child relationships and that there is insufficient evidence to support the terminations. Concluding that: (1) the trial court did not erroneously deny Mother's motion to dismiss the termination proceedings; (2) any error in the admission of Father's evidence was harmless; (3) DCS did not violate Parents' due process rights; and (4) there is sufficient evidence to support the terminations, we affirm the trial court's judgment.

We affirm.

# Issues

1. Whether the trial court erroneously denied Mother's motion to dismiss the termination proceedings.

2. Whether any error in the admission of Father's evidence was harmless.

3. Whether Parents' due process rights were violated because DCS failed to make reasonable efforts to preserve the parent-child relationships.

4. Whether there is sufficient evidence to support the termination of the parent-child relationships.

## Facts

The facts most favorable to the termination reveal that Mother and Father are the parents of P.M. ("P.M."), who was born in February 2014; S.M. ("S.M."), who was born in December 2015; and R.M. ("R.M."), who was born in February 2018 (collectively ("the children")). Parents first became involved with DCS in 2014 when P.M. was born. At that time, Mother tested positive for codeine, hydrocodone, and THC, and P.M. suffered from drug withdrawal symptoms. Mother had a prescription for hydrocodone but not for any of the other drugs. Parents entered into an informal adjustment with DCS, and the case was eventually closed.

In October 2016, Mother and Father were involved in a domestic altercation at their home, and Father pointed a loaded gun at Mother. Both P.M. and S.M. were home at the time. Father was arrested and charged with pointing a firearm, criminal recklessness while armed with a deadly weapon, and criminal confinement. However, the charges were dropped when Mother failed to cooperate with law enforcement. Parents subsequently entered into another informal adjustment with DCS. That case was also eventually closed. Mother became involved with DCS a month later, in November 2016, when DCS filed a petition alleging that Mother's oldest son, T.D., was a CHINS.

Six months later, in May 2017, three-year-old P.M. was nearly hit by a vehicle while he was wandering unsupervised in a parking lot. At the time, Father was slumped over the steering wheel of his vehicle, and Mother was in a nearby store. Authorities were called to the scene, and Mother tested positive for

methamphetamine, amphetamines, oxycodone, benzodiazepines, and buspirone. Mother had a prescription for buspirone but not for any of the other drugs. Father tested positive for methamphetamine, amphetamines, oxycodone, and benzodiazepines and did not have a prescription for any of the drugs. Parents admitted that they had used methamphetamine together and that Mother had given Father the oxycodone and benzodiazepines. Mother had gotten the pills from several different physicians as well as from friends.

Both P.M. and S.M. were removed from Parents that day because of Parents' substance abuse and failure to supervise their children. DCS filed petitions alleging that both children were CHINS. In August 2017, the trial court adjudicated P.M. and S.M. to be CHINS. Also in August 2017, DCS dismissed the CHINS case involving Mother's oldest child because the child was placed in a guardianship with his paternal grandmother.

In September 2017, the trial court issued a CHINS dispositional order in the cases involving P.M. and S.M. The order required Parents to: (1) complete a parenting assessment and successfully complete all recommendations; (2) complete a substance abuse assessment and successfully complete all recommendations; (3) compete all recommendations of any domestic violence assessment; (4) maintain suitable, safe, and stable housing; (5) obey the law; (6) submit to random drug screens; (7) not consume any controlled substances and only take prescription medicines for which a valid prescription existed and only in the doses and frequencies specified in the prescription; (8) not commit any acts of domestic violence; and (9) attend all scheduled visits with the children.

The trial court subsequently ordered Father to participate in a domestic violence treatment program. The initial plan was family reunification.

[8] In December 2017, DCS requested that the trial court find Mother in contempt for failure to comply with the CHINS dispositional order. When R.M. was born two months later in February 2018, the infant was immediately removed from Parents because they had failed to comply with the September 2017 CHINS dispositional order. DCS filed a CHINS petition specifically alleging that Parents' "lack of compliance with [court-ordered] services to address substance abuse, domestic violence, and other issues in the home prevent[ed] [DCS] from ensuring [R.M.]'s safety in the home." (Ex. Vol. 4 at 160). The trial court adjudicated R.M. to be a CHINS in April 2018 and issued a CHINS dispositional order in May 2018. The dispositional order contained the same requirements as the September 2017 CHINS dispositional order.

[9] Also in April 2018, Vanderburgh County Sheriff's Department Deputy Jeff Fentress ("Deputy Fentress") assisted United States Marshals ("the Marshals") with serving a felony warrant on Mother at her residence. The Marshals saw Mother inside the residence, but she refused to answer the door. When the Marshals entered the residence, they located Mother hiding under a pile of clothes in the bathroom. While inside the residence, the Marshals and Deputy Fentress found tramadol, naproxen, oxycodone, methamphetamine, and paraphernalia scattered on the countertops and beds, in Mother's purse, and on shelves in the closets. The drugs and paraphernalia were easily accessible to a young child. The Marshals and Deputy Fentress also found pills and

methamphetamine in a tin box with Father's name on it. The state charged both Mother and Father with felony possession of controlled substances and misdemeanor maintaining a common nuisance, specifically controlled substances.

[10] In May 2018, Mother and Father were involved in another domestic violence incident when Father grabbed Mother by her hair and pulled her to the ground. He eventually put his hands around her neck and choked her to the point that she almost passed out. Mother tried to escape several times, but Father kept pulling her back into his trailer. Father was charged with strangulation, domestic battery resulting in moderate bodily injury, and criminal confinement. These charges violated the terms and conditions of Father's bond in the April 2018 case. Later that month, Father was charged with invasion of privacy after he violated a no-contact order with Mother by bringing her to his home. Father was charged with invasion of privacy again after he violated the no-contact order by telephoning Mother 147 times while he was incarcerated. This charged also violated the terms and conditions of Father's bond in the April 2018 case.

[11] DCS Family Case Manager Loussa Numa ("FCM Numa") was assigned to the case in July 2018. Two other case workers had already worked on the case during the pendency of the proceedings. When she took over the case, FCM Numa noticed that Parents had not complied with the 2017 and 2018 CHINS dispositional orders. Mother was incarcerated, and Parents had been in and out of jail over the course of the proceedings. In addition, Parents' supervised visits

with the children had been stopped because Parents had not participated in substance abuse treatment or submitted to random drug screens.

[12] In August 2018, DCS filed a petition to terminate Parents' parental relationships with P.M. and S.M. Parents appeared at a September 2018 hearing in the cases of P.M. and S.M. At the beginning of the hearing, Mother asked for a continuance based on her allegation that she had been drugged, raped, and left in a ditch the previous night. Father did not object to a continuance but asked the trial court to reinstate his visitation with the children. FCM Numa responded that visitation had been stopped because Parents had not consistently attended the visits, which had been detrimental to the children. For example, when P.M. expected a visit and Parents failed to attend, the child would defecate in his pants. Father explained that he had only missed visits when he had been incarcerated. The trial court granted Mother's request for a continuance and Father's request to reinstate visitation.

[13] At the late September 2018 rescheduled hearing in the cases of P.M. and S.M., FCM Numa reported that Mother had tested positive for methamphetamine and amphetamines following the previous hearing. When the trial court asked Mother if her alleged assailant had put the drugs in "[her] system[,]" Mother responded that she did not remember. (Tr. Vol. 2 at 17). FCM Numa further reported that both parents had appearances scheduled in criminal court that afternoon. Mother had a pending forgery charge, and Father had violated the terms of his bond in the April 2018 case when he missed an appointment with his probation officer. He had missed the appointment because he had spent the

night with Mother and had overslept. FCM Numa asked the trial court to terminate Father's recently reinstated visitation, which Father had not been able to attend because of his arrest. The trial court temporarily suspended visitation because it wanted to see what would happen with Parents' criminal court appearances.

[14] Both parents were incarcerated at the time of the next hearing in P.M.'s and S.M.'s cases in October 2018. When the trial court mentioned scheduling a termination hearing P.M.'s and S.M.'s cases, Mother stated that she was "willing to waive the six[-]month time frame" to see whether DCS was going to file a termination petition in R.M.'s case. (Tr. Vol. 2 at 27). DCS objected to the delay. The trial court responded as follows to Mother's request: "I'm going to set trial dates, but it's going to be later than normal so that, quite frankly, [Parents] have more time to get their act together. If they don't, then the baby and the two older children can be tried at the same time." (Tr. Vol. 2 at 28). At the conclusion of the hearing, the trial court told Parents that when they were released from jail, "one of [their] very, very first phone calls should be to the [DCS] case manager and [to] say what do I need to do, remind me, and how do I do it. The responsibility is yours to get this done." (Tr. Vol. 2 at 30). The trial court scheduled the termination hearing in the cases of P.M. and S.M. for January 2019.

[15] In late October 2018, Father pled guilty to the April 2018 felony possession of a controlled substance and misdemeanor maintaining a common nuisance charges. Pursuant to the plea agreement, Father's felony would be reduced to a

misdemeanor if he successfully completed the terms and conditions of his probation.

[16] DCS filed a petition to terminate the parental relationship between parents and R.M. on December 19, 2018. At the January 2019 termination hearing regarding all three children, the trial court observed that there had been a discovery problem. Specifically, the computer disks that DCS had provided to Parents had apparently been defective. Parents requested a continuance to prepare their cases. The trial court responded that its "problem [was] that [it had] time deadlines. These cases, at least on the older kids, were open[ed] in August. Obviously, we can't meet the current deadlines on those two older kids[.]" (Tr. Vol. 2 at 35). Mother responded that she "would be willing to waive the time lines, and would in fact request the Court [to] allow her to waive the time lines" because she was incarcerated at the time. (Tr. Vol. 2 at 35). Mother further asked the trial court "to draw a parallel to criminal rule 4, which is waivable or the time at least tolls against the Defendant if the Defendant makes the motion[.] And to not allow the times lines to be waived by the parent, I think would violate due process and the ability of the parents to have a fair trial." (Tr. Vol. 2 at 35-36). DCS objected to a continuance. The trial court "grant[ed] the motions to continue based on the reasons stated" and scheduled the termination hearing for all three children for April 2019, which was the earliest date that the trial court, the CASA, the parties, and their respective counsels were all available. (Tr. Vol. 2 at 36). At the end of the hearing, DCS told the trial court that although it had previously offered Parents

substance abuse services, drug screens, supervised visits, couples counseling, domestic violence services, and a parent aid, DCS had now terminated all services. The trial court ordered DCS to continue to offer Parents drug screens at the state's expense and told Mother to contact FCM Numa as soon as she was released from jail.

[17] The termination hearing began in April 2019. Father testified that he and Mother had known each other for fifteen years and had been in a relationship for eight years. Father admitted that he had smoked marijuana daily for ten years and that he and Mother had smoked marijuana in the evenings and on the weekends during the course of their relationship. According to Father, he and Mother had started using pills together weekly about four years ago when Mother began sharing her prescription pills with Father. Mother and Father then began using methamphetamine together. Father admitted that he had used drugs until his arrest in April 2018 but maintained that he had not used drugs since that time. Father explained that although he had not participated in counseling pursuant to the CHINS dispositional orders and had been removed from the Safe Haven shelter and the NOW counseling program following his missed probation appointment in September 2018, he had subsequently been readmitted to the programs and now regularly attended counseling. Father admitted that his counselor had recommended that he not have contact with Mother because "it was not beneficial for [his] recovery," and Father "make[s] bad decisions when [he is] around her." (Tr. Vol. 2 at 89, 90). Despite his counselor's admonition, Father and Mother had talked to each other one to

three times a week for the past year, and had been intimate in April 2019, just two weeks before the termination hearing. Father further testified that he had recently been compliant with the terms and conditions of his probation because he did not "wanna go back to jail." (Tr. Vol. 2 at 94). Father also testified that he had a job and that his work schedule was 5:00 p.m. until 5:00 a.m. At the time of the hearing, he did not have childcare for his children and had previously told FCM Numa that he would "rely on [Mother] for child care." (Tr. Vol. 2 at 113).

[18] During Father's testimony, DCS offered into evidence DCS Exhibit P, Father's drug screen compliance reports, which had been compiled by Redwood Toxicology Laboratory. The reports, which did not include drug test results, revealed that Father had failed to attend more than forty scheduled drug screens from 2016 until 2018. Father objected that there was not "any essential and necessary foundation laid" for the exhibit. (Tr. Vol. 2 at 117). The trial court concluded that the exhibit was a certified record and admitted it over Father's objection.

[19] Also at the termination hearing, FCM Numa testified that Father had completed the CHINS court-ordered substance abuse evaluation but had never followed the assessor's recommendations. FCM Numa also testified that DCS had filed at least one information for contempt as to Father because of his lack of compliance with the CHINS dispositional orders. FCM Numa recognized that Father had recently "achieved the desired goal of working on sobriety" and was participating in NOW counseling services through the probation

department. (Tr. Vol. 2 at 135). However, FCM Numa stated that she "honestly . . . just fe[lt] like [Father was] going through the motions because of his probation" and was still concerned about his ability to care for his three children. (Tr. Vol. 2 at 144). She further explained that although the CHINS dispositional orders were issued in September 2017 and May 2018, Father had not participated in services until November 2018, when the trial court had ordered him to participate in services through the probation department as part of his plea agreement for the April 2018 drug charges. FCM Numa also pointed out that in January 2019, Father had attended only one of twenty-six sessions in a domestic violence program. Father told FCM Numa that he did not need to participate in the program because he did not have domestic violence problems and that the program conflicted with his job. FCM Numa believed that Father had refused to participate in the program because it had not been ordered through his probation. In addition, although Father was submitting drug screens through the probation office, he was not regularly submitting the drug screens that DCS had requested.

[20] FCM Numa further testified that Mother had never participated in any drug treatment or mental health programs because Mother "felt like she did not need any services." (Tr. Vol. 2 at 137). FCM Numa also testified that DCS had filed several informations for contempt as to Mother because she had failed to comply with the CHINS dispositional orders. According to FCM Numa, she remained concerned about Mother's ability to care for the children because she had never "complied with treatment. And then throughout the life of the

case[,] she was still testing positive for prescriptions and illegal drugs." (Tr. Vol. 2 at 144). FCM Numa also testified that Mother had never asked about how her children were doing and, during the course of the CHINS proceedings, Mother's visits with the children had never progressed beyond supervised visitation. At the time of the termination hearing, Mother was living with a friend and did not have enough space for the three children to live with her.

[21] Also during the hearing, Father's probation officer, Melinda Littell ("Probation Officer Littell") testified that, from April 2018 until October 2018, Father had violated the conditions of his bond five times by committing additional offenses and by failing to attend drug screens and probation meetings. However, Father had been compliant with probation requirements, including drug screens, probation meetings, and counseling since being sentenced in November 2018. According to Probation Officer Littell, Father was on track to successfully complete a program that would reduce his felony conviction to a misdemeanor.[1]

[22] CASA Ruth Kauk ("CASA Kauk") testified that she had been assigned to the case in June 2018. At that time, Parents had not been compliant with the CHINS dispositional orders. Specifically, according to CASA Kauk, Father had missed multiple drug screens and had not started "screening until his

---

[1] It appears that Mother had also been offered the opportunity to participate in a diversion program to reduce her felony conviction to a misdemeanor conviction. However, she was apparently terminated from the program when she violated a no-contact order by talking to Father.

release from incarceration in July of 2018." (Tr. Vol. 2 at 180). CASA Kauk also testified that although Father had begun complying with his probation requirements after his sentencing in November 2018, Father continued to refuse to participate in CHINS court-ordered programs. For example, in January 2019, Father told CASA Kauk that he would not be participating in the domestic violence program because "he'd never touched [Mother] and did not have a domestic violence problem." (Tr. Vol. 2 at 181). Further, in January or February 2019, Father told CASA Kauk that because he worked the night shift, he only had time for probation appointments, work, and sleep. The only possible option for childcare that he had identified was Mother. According to CASA Kauk, Father believed that Mother was mentally and emotionally ready to provide childcare to the three children. Father also told CASA Kauk that it was not possible for him to switch shifts or jobs.

[23] CASA Kauk was also concerned that Parents "get in trouble together and they lead each other to make poor decisions. They have a pattern of incarceration." (Tr. Vol. 2 at 183). According to CASA Kauk, Father had spent 109 days in jail in 2018, which included jail time for the April 2018 drug charges, the May 2018 domestic violence charges, and the May 2018 invasion of privacy charges. All of these incidents involved Mother. CASA Kauk pointed out that "Father [had done] well for periods of time and then Mother and Father get back together and all of a sudden (indiscernible)." (Tr. Vol. 2 at 185). Father had also served jail time for missing probation appointments, drug screens, and counseling appointments. CASA Kauk agreed that "this [was] all time that

they could've been spending participating in services and spending time with their children." (Tr. Vol. 2 at 184).

[24] Testimony regarding the children revealed that P.M. and S.M. had been in foster care for more than two years, and that R.M. had been in foster care for his entire life. S.M. and R.M. were thriving in the same pre-adoptive foster home, and P.M was in a foster home with the possibility that he would be placed with maternal grandmother. P.M. required therapy for behavior issues, and S.M. had been diagnosed with global developmental delay. CASA Kauk testified that S.M.'s foster mother had reported that S.M.'s behavioral problems had "dramatically decreased. He head[-]bang[ed] only once a month now. And the self-harming behavior ha[d] also decreased." (Tr. Vol. 2 at 186). FCM Numa testified that P.M. and S.M. both had routines that "ha[d] to continue in order for them to be able to function." (Tr. Vol. 2 at 148). According to FCM Numa, the children needed "a stable parent, a sober parent. That parent needs to be able to provide shelter for the kids, food, clothing, proper supervision, have daycare line up if they need to, making sure that the kids are attending scheduled appointments." (Tr. Vol. 2 at 148). When asked whether a continuation of the parent-child relationship posed a threat to the well-being of the children, both CASA Kauk and FCM Numa responded that it did. Both service providers also testified that termination and adoption were in the children's best interests.

[25] At the end of the first day of the hearing, the parties agreed to continue it until May 16, 2019. At the May hearing, Father testified that although his work

schedule would be changing to 10:00 a.m. until 8:00 p.m. at some unspecified point in the future, he still did not have a plan for childcare. He also did not have suitable housing for the children although he claimed that he had saved enough money to obtain it. Father also admitted that FCM Numa had offered him referrals for services in the past. However, he claimed that he did not know that DCS-provided services were not permanent and would lapse if he failed to participate in them or was incarcerated. Father further admitted that he had failed to tell his counselor that he had been intimate with Mother but further explained that the counselor had "put [him] on a no[-]contact with [Mother] while [Father] was in the counseling services [and] [the counselor had] released [Father] from all that." (Tr. Vol. 2 at 212).

[26]   At the end of the hearing, Mother asked the trial court to order services for her. The trial court responded that Mother could participate in services voluntarily but that it was not going to order the State to provide them. The trial court also ordered the parties to submit findings of fact and conclusions thereon within thirty days.

[27]   In July 2019, before the trial court had issued its order in the termination cases, Parents each filed a motion to dismiss the termination cases because the trial court had held the termination hearing outside the 180-day time limit set forth in INDIANA CODE § 31-35-2-6(a)(2). Although Mother has not included a copy of her motion in her appendix, she apparently argued that the trial court had violated her due process rights because it had failed to follow the statutory

timeline regarding termination hearings. In addition, Father asked the trial court to reopen the evidence. The trial court denied Parents' motions.

[28]     In August 2019, the trial court issued an eighteen-page order terminating the parental relationships between Parents and P.M., S.M., and R.M. In its order, the trial court concluded, in relevant part, as follows:

> 10.     Court agrees with DCS and CASA that continuation of the parent-child relationship poses a threat to the children's well-being. Parents' habitual patterns of behavior, especially their recurring involvement in criminal acts, demonstrate that they are unable to make decisions in their own best interests, let alone make decisions in the best interest of the child. *See Castro vs. State Office of Family and Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) *trans. denied*. Both parents have missed out on a great deal of time with the children due to their incarceration. Mother has been incarcerated numerous times since these cases started, up until February of this year. Father has been incarcerated at least one hundred and nine days just since April 23, 2018.
>
> 11.     The children have stability in their current home. The Court agrees with CASA Kauk that [P]arents' inconsistency poses a threat to the child[ren]'s current stability. CASA described the child[ren]'s relationship with parents as "back and forth," adding that it is this "inconsistency that really hurts."
>
> 12.     When asked why he was complying with terms of probation this time around when he had not previously, Father said "I don't want to go to jail." When asked why he had started to comply with substance abuse services, Father cited "jail," "probation," and the "hopes to see his boys again," in that order. The children were removed from Father's care in May of 2017. These services were available and have been ordered by the Court for over one (1) year. Father has just recently

demonstrated compliance since jail and probation began to threaten his liberty. The children need a caretaker that will make him their priority.

13.    The parents have also established through their previous actions a[n] habitual pattern of returning to one another, despite the weight of evidence suggesting this is not in their own best interest.  The parents have a history of using illegal substances with one another and engaging in instances of serious domestic violence.  These shared activities have repeatedly led to their contemporaneous incarceration.  Parents' behaviors and decision-making while they are together pose a threat to their own well-being, as well as the well-being of the child[ren].  The Court cannot ignore this pattern when determining the probability of future neglect or deprivation of the children.

14.    *See In re A.K.*[924 N.E.2d 212,] 224 [(Ind. Ct. App. 2010), *trans. dismissed*] (finding that continuing in a relationship with an unfit parent may form the basis for the Court's finding that continuation of the parent-child relationship poses a threat to the child's well-being).

[29]  Each parent separately appeals the termination of his and her relationships with their three children.

# Decision

[30]  Mother argues that the trial court erroneously denied her motion to dismiss the termination proceedings.  Father argues that the trial court abused its discretion when it admitted evidence.  Parents argue that their due process rights were violated because the DCS failed to make reasonable efforts to preserve the

parent-child relationships and that there is insufficient evidence to support the terminations. We address each of these contentions in turn.

## 1. Mother's Motion to Dismiss

Mother first contends that the trial court erroneously denied her motion to dismiss the termination cases. She specifically argues that the trial court failed to complete the termination hearing in compliance with INDIANA CODE § 31-35-2-6.

 "Matters of statutory interpretation present pure questions of law; as such, these questions are review *de novo*." *Rodriguez v. State*, 129 N.E.3d 789, 793 (Ind. 2019). INDIANA CODE § 31-35-2-6 provides as follows:

> (a) Except when a hearing is required after June 30, 1999, under section 4.5 of this chapter, the person filing the petition shall request the court to set the petition for a hearing. Whenever a hearing is requested under this chapter, the court shall:
>
>> (1) commence a hearing on the petition not more than ninety (90) days after a petition is filed under this chapter; and
>
>> (2) complete a hearing on the petition not more than one hundred eighty (180) days after a petition is filed under this chapter.
>
> (b) If a hearing is not held within the time set forth in subsection (a), upon filing a motion with the court by a party, the court shall dismiss the petition to terminate the parent-child relationship without prejudice.

[33]     Here, DCS filed its termination petitions for P.M. and S.M. on August 23, 2018, and for R.M. on December 19, 2018.  The combined termination hearing for all three children began on April 18, 2019 and was completed on May 16, 2019.  Although the April and May 2019 hearings were timely as to R.M.'s termination petition, they were not timely as to the termination petitions for P.M. and S.M. because they were not completed within the one-hundred-eighty-day timeline set forth in the statute.  However, we conclude that Mother invited this error and cannot now seek to use the error to her advantage.

[34]     The Indiana Supreme Court recently explained as follows:

> The invited-error doctrine is based on the doctrine of estoppel and forbids a party from taking advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct.  Where a party invites the error, [he or] she cannot take advantage of that error.  In short, invited error is not reversible error.

*Matter of J.C.*, 142 N.E.3d 427, 432 (Ind. 2020) (internal citations omitted).

[35]     Here, our review of the evidence reveals that, at the October 2018 hearing in the cases of P.M. and S.M., Mother said she was "willing to waive the six[-]month time frame" to see whether DCS was going to file a termination petition in R.M.'s case.  (Tr. Vol. 2 at 27).  Then, at the January 2019 termination hearing, Mother requested that the trial court "allow her to waive the [statutory] time line" because she was incarcerated at the time.  (Tr. Vol. 2 at 35).  Mother further asked the trial court to draw a parallel to Criminal Rule 4, which tolls the time against a criminal defendant when the defendant files a motion to

continue the trial. Mother also argued that the trial court would be committing a due process violation if it refused to allow her to waive the statutory timeline.

[36] Because Mother affirmatively waived the 180-day statutory requirement and invited the court to conduct the hearings outside the statutory time requirement, Mother cannot now invoke the requirement as a basis for reversal. *See J.C.,* 142 N.E.2d at 432 (citing *In re N.C.*, 83 N.E.3d 1265, 1267 (Ind. Ct. App. 2017)) (concluding that a parent in a TPR case could be afforded no relief on appeal where, when the hearing was being scheduled, the court reporter proposed a hearing date 222 days after the petition's filing and the parent's counsel responded, "That sounds good"). The trial court did not erroneously deny Mother's motion to dismiss the termination proceedings.[2]

## 2. Admission of Evidence

[37] Father argues that the trial court abused its discretion in admitting evidence. Specifically, he contends that Exhibit P, the toxicology lab's compliance reports, constituted inadmissible hearsay. However, at the termination hearing, Father's sole argument was that DCS had failed to establish a foundation for the exhibit. Father has therefore waived appellate review of the hearsay

---

[2] Mother also appears to argue that the trial court should have dismissed the termination proceedings because the trial court's termination order was entered more than ninety days after the last day of the termination hearing in violation of Indiana Trial Rule 53.2(A). However, Trial Rule 53.2(A) does not contemplate a dismissal if the trial court fails to enter an order within ninety days. Rather, pursuant to the rule, Mother was entitled to move to withdraw the proceedings from the trial court and request that the Indiana Supreme Court appoint a special judge to rule on the petition. Mother, however, did not so move. The trial court did not erroneously deny Mother's motion to dismiss the termination proceedings.

argument because he did not raise it at the termination hearing. *See Konopasek v. State*, 946 N.E.2d 23, 27 (Ind. 2011) (explaining that an objection for one evidentiary ground does not preserve another evidentiary ground for appeal).

[38] Waiver notwithstanding, any error in the admission of this exhibit was harmless. This is because the remaining evidence presented at the termination hearing, including Father's testimony that he had continued to use drugs until April 2018 and the evidence as discussed below, satisfies this Court that there is no substantial likelihood that the challenged evidence contributed to the judgment. *See Termination of the Parent-Child Relationship of E.T.*, 808 N.E.2d 639, 646 (Ind. 2004) (explaining that the improper admission of evidence is harmless error when the judgment is supported by substantial independent evidence to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the judgment).

### 3.  Reasonable Efforts and Due Process

[39] Parents argue that DCS failed to make reasonable efforts to preserve the parent-child relationships, resulting in a violation of their due process rights. When DCS seeks to terminate parental rights, "it must do so in a manner that meets the prerequisites of due process." *In re J.K.*, 30 N.E.3d 695, 699 (Ind. 2015) (quotations and citations omitted). Whether due process has been afforded in termination proceedings is determined by balancing the following "three distinct factors" specified in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976):  (1) the private interests affected by the proceeding; (2) the risk of error created by

the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *A.P. v. Porter Cnty. Off. of Family and Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied*.

[40] In *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (citing *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)), this Court further explained the *Mathews* factors as follows:

> The private interest affected by the proceeding is substantial – a parent's interest in the care, custody, and control of his or her child. And the State's interest in protecting the welfare of a child is also substantial. Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions.

[41] DCS must "make reasonable efforts to preserve and reunify families." IND. CODE § 31-34-21-5.5(b). In addition, "due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014) (quotations and citations omitted). "[T]hese two proceedings - CHINS and TPR - are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter[.]" *Id.*

[42] However, the "failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009); *see also In re E.E.*, 736 N.E.2d 791, 796 (Ind.

Ct. App. 2000) ("[T]he provision of family services is not a requisite element of our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statue and require reversal."). Further, a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he or she was denied services to assist him or her with his or her parenting. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000).

[43] Here, Parents appear to argue that DCS failed to make reasonable efforts to preserve the parent-child relationships because it failed to offer them services. As a preliminary matter, we note that the law is well established that a party on appeal may waive a constitutional claim. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003). For example, in *In re K.S.,* 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001), this Court determined that a mother had waived her claim that the trial court had violated her due process rights because she raised the constitutional claim for the first time on appeal.

[44] Parents in this case did not object to any alleged deficiencies in the CHINS process during the CHINS proceedings, nor did they argue during the termination proceedings that those alleged deficiencies constituted a due process violation. Rather, Parents have raised their due process claim for the first time on appeal. They have therefore waived appellate review of this issue.

[45] Waiver notwithstanding, our review of the record reveals that DCS offered Parents the following services in the September 2017 when the trial court issued the CHINS dispositional orders in the cases of P.M. and S.M: (1) parenting, substance abuse, and counseling services; (2) drug screens; and (3) supervised visitation with their children. DCS offered Parents these services with a plan for family reunification. Although Parents neither participated in nor benefited from these services, DCS again offered them to Parents eight months later in the May 2018 when the trial court issued the dispositional order in R.M.'s case. Parents again failed to participate in and benefit from these services and now complain that they should have been offered more services. DCS offered Parents sufficient services in its attempt to preserve and reunify Parents' family. Based on the foregoing, Parents have not established that their due process rights were violated.[3]

## 4. Sufficiency of the Evidence

[46] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*.

---

[3] We further note that Parents have not established that DCS engaged in conduct that affected their ability to participate in and complete services aimed at reunifying them with their children. *Cf. Matter of C.M.S.T.*, 111 N.E.3d 207, 213 (Ind. Ct. App. 2018) (concluding that "the chaotic and unprofessional handling" of a CHINS case violated the parents' due process rights, requiring reversal of the termination order); *A.P.*, 734 N.E.2d at 1117 (finding parents' due process rights were violated in a termination proceeding where DCS made multiple procedural errors, such as failing to provide parents with copies of case plans and filing CHINS and termination petitions that did not meet statutory requirements).

However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Id.* at 1188. Termination of the parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[47] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.,* 989 N.E.2d 1225, 1230 (Ind. 2013).

[48]     When reviewing a termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We consider only the evidence and any reasonable inferences to be drawn therefrom that support the judgment and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *K.T.K.*, 989 N.E.2d at 1229.

[49]     We further note that, in determining whether to terminate a parent-child relationship, trial courts have discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination and may find that a parent's past behavior is the best predictor of future behavior. *D.B.M. v. Indiana Dep't of Child Services*, 20 N.E.3d 174, 181-82 (Ind. Ct. App. 2014), *trans. denied*. We have also stated that the time for a parent to rehabilitate himself or herself is during the CHINS process, before DCS files a termination petition. *Prince v. Dep't of Child Services*, 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007).

[50]     Parents argue that DCS failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside the home will not be remedied; and (2) a continuation of the parent-child relationships poses a threat to the children's well-being. However, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed*. We therefore discuss only whether there is a reasonable probability

that a continuation of the parent-child relationship poses a threat to the children's well-being.

[51] The continuation of the parent-child relationship poses a threat to children's well-being when: (1) their parents engage in destructive and dangerous behavior; (2) the behavior is ongoing without any serious sign of improvement; and (3) the behavior poses a threat to their children. *In re A.I.*, 825 N.E.2d 798, 807 (Ind. Ct. App. 2005), *trans. denied*. In addition, this Court has previously stated that a Father's continued relationship with a Mother who was unable to remain drug free, manage her mental illness, and maintain stable housing was a proper consideration in determining whether there was a reasonable probability that a continuation of Father's relationship with the child posed a threat to the child's well-being. *See A.K.*, 924 N.E.2d at 224.

[52] Here, our review of the evidence reveals that, for several years, Mother and Father have been involved in a tumultuous relationship, which has included drug use, domestic violence, and multiple incarcerations for both parents. This relationship has also led parents to neglect their children's needs and place them in dangerous situations. Neither parent has complied with the 2017 or 2018 CHINS dispositional orders. Father began to comply with court-ordered drug screens and counseling through the probation department in November 2018 after he was sentenced for the April 2018 felony offense. However, he still refused to comply with the CHINS dispositional orders, including a domestic violence program. Father also maintained regular contact with Mother throughout the CHINS proceedings, including being intimate with her just two

weeks before the April 2019 termination hearing, while acknowledging that Mother led him to make bad decisions. Father also believed that it would be appropriate for Mother, who had failed to comply with the CHINS dispositional orders and who was frequently incarcerated, to provide childcare to their children while he worked twelve-hour shifts. This evidence supports the trial court's conclusion that a continuation of the parent-child relationship poses a threat to the children's well-being. We find no error.

[53] Parents next argue that there is insufficient evidence that the termination was in the children's best interests. In determining whether termination of parental rights is in the children's best interests, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the children involved. *Id.* In addition, children's needs for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). Further, the testimony of the service providers may support a finding that termination is in the children's best interests. *McBride*, 798 N.E.2d at 203.

[54] Here, our review of the evidence reveals that both FCM Numa and CASA Kauk testified that termination was in the children's best interests. The testimony of FCM Numa and CASA Kauk, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in the children's best interests.

[55] We have previously recognized that this Court is ever mindful of the fact that the trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding the termination of the parent-child relationship. *Matter of D.G.,* 702 N.E.2d 777, 781 (Ind. Ct. App. 1998) (citing *Stone v. Daviess Cnty Div. of Children & Family Servs.,* 656 N.E.2d 824, 828 (Ind.Ct.App.1995), *trans. denied*). Recognizing that the trial court listened to the testimony of all the witnesses at the two-day termination hearing, observed their demeanor, and judged their credibility, as a reviewing court, we must give proper deference to the trial court. Accordingly, we hold that the trial court was justified in concluding that the DCS proved by clear and convincing evidence that parents' parental rights should be terminated.

[56] Affirmed.

May, J., and Crone, J., concur.